CHIN, *Circuit Judge*, dissenting:

Defendant-appellee Meta Platforms, Inc. ("Meta"), the social media company, operates Instagram, among other popular social networking applications ("apps"). According to plaintiff-appellant Phhhoto Inc. ("Phhhoto"), "[n]o other platforms rival Meta in the market for personal social networking services." J. App'x at 137 (Amended Complaint ("AC") ¶ 156).

Launched in 2014, Phhhoto was a social media app that allowed users to capture a burst of still photos and then loop them together into a video to create a moving image, known as a "phhhoto." At its peak, Phhhoto enjoyed "approximately 3.7 million [monthly average users]." *Id.* at 89 (AC ¶ 6). After just over three operative years, however, Phhhoto shut down operations on June 20, 2017, citing Meta's "fraudulent and anticompetitive conduct" as the reason. *Id.* at 127 (AC ¶ 128).

In this case, Phhhoto accuses Meta of violating section 2 of the Sherman Antitrust Act ("Section 2"), 15 U.S.C. § 2, based on Meta's allegedly anticompetitive behavior toward it. Its claims accrued no later than April of 2016. Yet, it did not file suit until November 4, 2021, well more than four years later. Phhhoto argues, however, that the district court erred when it granted

Meta's motion to dismiss on timeliness grounds, declining to equitably toll the statute of limitations under a theory of fraudulent concealment.

Applying a *de novo* standard of review, the majority concludes "that the district court erred at each step of the fraudulent concealment analysis." Maj. Op. at 17. While I agree that *de novo* review applies, I disagree that the district court erred. Phhhoto's allegations in the Amended Complaint demonstrate as a matter of law that it was on inquiry notice of Meta's anticompetitive conduct -- and thus had the requisite information to file suit -- well before October 25, 2017, the date on which Phhhoto claims it first began "to discover [Meta's] fraudulent and anticompetitive conduct." J. App'x at 50. Phhhoto's allegations further undermine its claims as to the other elements of its fraudulent concealment claim. I would affirm and, accordingly, I respectfully dissent.

I.

As Phhhoto alleges, "[n]ew entrants in the market for personal social networking services" face a challenge because they "must convince users that enough of their friends and family members will also engage with the social networking platform to make use of the platform worthwhile." *Id.* at 139 (AC ¶ 164). Throughout its lifespan as a social media app, Phhhoto relied on various

2

aspects of Meta's ubiquity in the social media universe to build and maintain its own user base. There was something in it for Meta, too, in this relationship: by offering Phhhoto access to key bits of its own infrastructure, Meta ensured that its users did not need to "exit the Meta ecosystem" even when those users explored other non-Meta platforms like Phhhoto. *Id.* at 140-41 (AC ¶ 169).

At the beginning of Phhhoto's relationship with Meta, the companies shared a "symbiotic relationship." Maj. Op. at 7. But over time, and through a distinct set of adverse acts alleged by Phhhoto, Meta dealt several blows to Phhhoto's stability as a platform, as it rescinded Phhhoto's privileges and access to critical components of Meta's social networking ecosystem.

The first integration feature that benefited Phhhoto was Meta's "Find Friends" Application Programming Interface ("API"). APIs are digital tools that facilitate data-sharing, functionality, and overall integration between two platforms. The Find Friends API allowed third-party apps like Phhhoto to access a user's Instagram friends list. When a user linked her Phhhoto account to her Instagram credentials, she could instantly access a list of Instagram friends who also had Phhhoto accounts. The Find Friends API thus allowed Phhhoto users to

3

"recreate their social graph" from Instagram, thereby alleviating what Phhhoto described as a barrier to entry for new platforms. J. App'x at 109 (AC ¶ 65).

The second feature was the "iPhone Hooks," which allowed users to post their phhhotos, created in the Phhhoto app, directly to Instagram. J. App'x at 163-64. Before a user publishes a post to Instagram, she has the option of adding a written caption that appears under the post. The caption can contain hashtags, which, when clicked, directs users to all other public posts whose caption features that hashtag. The iPhone Hooks pre-populated captions of phhhotos posted to Instagram with hashtags that attributed the posted content to Phhhoto. The benefit to Phhhoto was that, when a user posted her phhhotos directly to Instagram, the caption would contain a #phhhoto hashtag, which directed traffic to the app and attributed the content to Phhhoto.

On March 31, 2015, Meta abruptly revoked Phhhoto's access to the Find Friends API. Phhhoto alleges that Meta withdrew access "because [it] viewed Phhhoto as a potential competitive threat." *Id.* at 109 (AC ¶ 66). Phhhoto further alleged that the loss of the Find Friends API had a "negative[] impact [on] how potential investors perceived Phhhoto." *Id.* (AC ¶ 65). A few months later, on August 9, 2015, Meta also suspended the use of the iPhone Hooks for all third-

party apps, explaining that the pre-populated captions featuring the hashtags looked "spammy" on the Instagram feed. *Id.* at 111 (AC ¶ 71). Phhhoto alleges, however, that the "spammy" rationale "was pretextual." *Id.* (AC ¶ 72).

In addition to these integration features, Phhhoto and Meta nearly entered into a partnership. Earlier, on February 26, 2015, Meta's Strategic Partnerships Manager contacted one of Phhhoto's founders, Champ Bennett, to discuss integrating Phhhoto's moving photo technology into Facebook's newsfeed. The project was never memorialized in a contract, however, and after some delays related to "legal conversations," Meta apparently abandoned the integration project in June of 2015. J. App'x at 166-67.

On October 22, 2015, Phhhoto was set to launch for Android devices. That morning, however, Meta issued its own announcement: it was launching Boomerang -- what Phhhoto describes as "a slavish clone of Phhhoto." *Id.* at 112 (AC ¶ 77).

On March 15, 2016, Meta issued a press release announcing a change to the order in which it sorted user's posts on Instagram. Until then, Instagram delivered content to users chronologically -- the most recent posts appeared at the top of the feed, and users scrolled down to see older content. Meta's switch

5

to the so-called "algorithmic newsfeed" discarded the chronological sorting in favor of an algorithm-driven shuffling that presented posts to users "based on the likelihood you'll be interested in the content, your relationship with the person posting and the timeliness of the post." *Id.* at 114-15 (AC ¶¶ 86-87).

Shortly thereafter, in April 2016, Phhhoto noticed that its "new user registrations declined precipitously." *Id.* at 116 (AC ¶ 91). Its ranking among photo and video platforms in "the Apple App Store dropped from 11th place to 41st place." *Id.* The change was abrupt and unprecedented; "Phhhoto had never before experienced such a significant decline in its ranking." *Id.* Prompted by this sudden decline in popularity, Phhhoto "worked tirelessly" to determine the reason behind the sharp decline. *Id.* (AC ¶ 92). Phhhoto claims it focused its efforts on problems with its own code, in reliance on Meta's press release statement: that "[t]he order of photos and videos in your feed will be based on the likelihood you'll be interested in the content, your relationship with the person posting and the timeliness of the post." *Id.* at 116-17 (AC ¶ 92).

On October 25, 2017, after Phhhoto shut down operations, Bennett "sought to connect Phhhoto's remaining Instagram followers to Hypno, a company that "had little social media presence." *Id.* at 119 (AC ¶ 104). Bennett

6

posted the same promotional video to Hypno's Instagram account and Phhhoto's Instagram account. Phhhoto claims that, after posting the same video from both accounts, "the post from the old Phhhoto account appeared to *vanish* from Bennett's own Instagram feed." *Id.* at 120 (AC ¶ 105) (emphasis in original). This, Phhhoto alleges, was the moment at which it discovered that Meta was engaging in anticompetitive conduct -- namely, through suppressing Phhhoto's content on the algorithmic feed.

## II.

The district court did not err in concluding as a matter of law that the statute of limitations should not be subject to the extraordinary remedy of equitable tolling, as Phhhoto failed to sufficiently plead that it met the requisite elements of fraudulent concealment.

### A. Elements of Fraudulent Concealment

To succeed on a fraudulent concealment claim, a plaintiff must establish: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing

7

ignorance was not attributable to lack of diligence on his part." *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).

## B. Application

Phhhoto is not entitled to the judicial remedy of equitable tolling under a theory of fraudulent concealment because (1) it fails to plausibly allege that Meta's March 2016 press release was concealing; (2) Phhhoto's own allegations undermine its claim that it had no notice of a potential antitrust claim until October 25, 2017; and (3) Phhhoto fails to allege that it acted with reasonable diligence.

### 1. Concealment

To plead the first element of fraudulent concealment, Phhhoto must plausibly allege that Meta "concealed . . . the existence of [its] cause of action." *Id.* Phhhoto can meet this burden by showing either that Meta took affirmative steps to conceal its wrongdoing or that the wrongdoing was self-concealing. *Id.* But it must plead elements of fraudulent concealment with particularity, in accordance with the heightened pleading standards set forth in Rule 9(b) of the Federal Rules of Civil Procedure. *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983). Phhhoto contends that Meta engaged in fraudulent concealment when it issued a

8

press release in 2016 that announced a new algorithm for displaying posts. As the district court concluded, however, Phhhoto failed to plausibly allege that Meta's public announcement about the algorithm was fraudulent in any respect. Nor does it make sense, as Phhhoto asserts, that the change in algorithm was "self-concealing." Appellant's Br. at 33.

Fraudulent concealment requires proof of a "trick or contrivance intended to exclude suspicion and prevent inquiry." *Wood v. Carpenter*, 101 U.S. 135, 143 (1879). Phhhoto has not plausibly explained how the statements in Meta's 2016 press release constituted fraudulent concealment. This was a press release publicly announcing a new feed that would display posts based on metrics that measured user interest, relationship, and timeliness. Even considering the press release in the light most favorable to Phhhoto, Phhhoto fails to plausibly allege that there was anything in the press release that was false, fraudulent, or misleading. Phhhoto fails to explain how the announcement affirmatively concealed wrongdoing.

Apparently, Phhhoto contends that Meta concealed the "anticompetitive element in the algorithm's operation . . . by making false public statements representing how the algorithm worked." Appellant's Br. at 30.

9

Phhhoto contends, essentially, that Meta intended to harm Phhhoto and that the press release should have disclosed these facts. But this was a press release and Phhhoto -- and the public -- was being given notice of the change in the display procedures. There is nothing fraudulent about that notice. And Meta made no representation that Phhhoto would do better under the new algorithm.

Instead, Phhhoto itself acknowledges that "its own content might be promoted or demoted by Meta's algorithm." *Phhhoto Inc. v. Meta Platforms, Inc.*, No. 21-cv-06159 (KAM) (LB), 2023 WL 2710177, at *16 (E.D.N.Y. Mar. 30, 2023). But the suggestion that Meta should have disclosed to Phhhoto and others that its new procedures might give it a competitive advantage makes no sense.

Moreover, Phhhoto fails to explain "*why* Meta's algorithm, 'if actually implemented as Meta had described,' would have optimized 'Phhhoto users' posts, rather than disfavored those posts." *Phhhoto*, 2023 WL 2710177, at *16 (citing J. App'x at 115-16 (AC ¶ 89)). As Meta points out, "Phhhoto does not allege that Meta said that Phhhoto's content was *not* being disfavored by the new algorithm." Appellee's Br. at 26. In my view, it is not enough that Phhhoto alleges that it was enjoying millions of users on a monthly basis -- it does not follow that, just because an app has many users, its posts would perform just as

10

well or better with Instagram's new algorithm. On this record, I disagree that Phhhoto has adequately pled fraudulent concealment.

## 2. Notice

Phhhoto fails to allege sufficient facts supporting the second prong -- that Phhhoto remained in ignorance of its cause of action until October 2017. Indeed, Phhhoto's own allegations demonstrate that it had notice of its claim by no later than April 2016. Once the "plaintiff ha[s] notice of th[e] possibility" of its claim, the "plaintiff is charged with whatever knowledge an inquiry would have revealed." *Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992). I agree with the majority that, to find inquiry notice as a matter of law on a motion to dismiss, there must be "uncontroverted evidence clearly demonstrat[ing] when the plaintiff should have discovered the [challenged] conduct." *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 427 (2d Cir. 2008). Unlike the majority, however, I think there are such facts alleged in Phhhoto's Amended Complaint itself.

For instance, Phhhoto alleged a "precipitous" "decline" in users, a "never before experienced" reduction in its App Store rankings, and "sudden[] unpopular[ity]" shortly after the algorithmic feed was rolled out. J. App'x at 116-

11

17 (AC ¶¶ 90-92). This steep decline in business occurred in the context of a litany of Meta's other adverse actions, including:

- **March 31, 2015**: Meta abruptly revokes Phhhoto's access to Instagram's Find Friends API;
- **June 8, 2015:** Meta stops responding to Phhhoto about the integration project;
- **August 9, 2015**: Meta withdraws access to the iPhone Hooks for third-party applications;
- **October 22, 2015**: Meta announces its new app Boomerang, a clone of Phhhoto;
- **March 15, 2016**: Meta announces change to the Instagram algorithm; and
- **April 2016**: Phhhoto notices steep drop in new user registrations.

These facts surely put Phhhoto on inquiry notice that Meta might be taking action against it.

Phhhoto states in a conclusory fashion that it relied on the representations in the March 2016 press release to rule out anticompetitive behavior stemming from the algorithmic feed. I agree with the district court that Phhhoto presents "[n]o plausible facts . . . [to] explain why the Phhhoto founders would rule out [the aforementioned] external possibilities and ignore its duty to inquire." *Phhhoto*, 2023 WL 2710177, at *18.

The majority suggests that Meta's creation of Boomerang, in the context of the parties' relationship, did not contribute to placing Phhhoto on

12

notice of anticompetitive behavior. *See* Maj. Opp. at 39. As the majority recognizes, however, the law requires only a "'probability' of wrongdoing to trigger inquiry notice." *Id.* at 38. Phhhoto's business decline occurred only a few months after Meta rolled out a product nearly identical to Phhhoto's, and just one month after Meta changed its algorithm. Particularly because Phhhoto's business success was reliant on the underlying platform created by Meta, Meta's creation of Boomerang was another incident among many that reasonably placed Phhhoto on notice that Meta was engaging in anticompetitive behavior.

      Phhhoto's other allegations about Meta's pattern of anticompetitive behavior further undermine its claim that it had no reason to believe Meta was engaged in anticompetitive conduct until Bennett's happenstance discovery in October 2017. Its Amended Complaint, which spans almost 70 pages, explains in detail the sudden and inexplicable actions Meta took -- rescinding access to social networking infrastructure that Phhhoto relied on, introducing a competitor on the day that Phhhoto planned on rolling out its Android capabilities, and letting a business relationship go cold over seemingly nothing. And Phhhoto alleges that, from its inception, it was reliant on critical support from Meta through APIs and other tools. Based on these factual allegations, I agree with the district court

13

that it is implausible that Phhhoto had no reason to suspect wrongdoing until October 2017.

The Fourth Circuit's reasoning is persuasive on this point: "[w]here a plaintiff knows of a pattern of particular actions that a defendant has taken against him," that plaintiff "is on inquiry notice of his claim" even if "the pattern's precise scope might be unclear and its exact legal ramifications uncertain." *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 179 (4th Cir. 2007); *see also Klein v. Bower*, 421 F.2d 338, 343 (2d Cir. 1970) ("[T]he statutory period . . . [must] not await [plaintiff's] leisurely discovery of the full details of the alleged scheme.").

The majority reasons that Meta "offered plausible, non-exclusionary justifications" for some of its changes, and therefore Phhhoto cannot be charged with notice. Maj. Op. at 32. For example, the majority notes that Meta explained its decision to withdraw the iPhone Hooks capability by stating that the pre-populated hashtags felt "spammy." *Id.* (quoting J. App'x at 111 (AC ¶ 71)). But Phhhoto specifically alleged that Meta's "professed . . . rationale" for withdrawing the iPhone Hooks access was "pretextual." J. App'x at 111 (AC ¶ 72).

14

And perhaps most crucially, Phhhoto's own allegations show that the algorithm was not self-concealing. Phhhoto fails to support its contention that it could not discover or was not on notice of the algorithmic suppression despite noticing such a dramatic drop in user engagement shortly after the algorithm changed.

### 3. Reasonable Diligence

Phhhoto argues that it plausibly alleged that it acted with reasonable diligence, which "is a prerequisite to the applicability of equitable tolling." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012). Again, Phhhoto's own allegations belie this point. As noted above, Meta abruptly revoked Phhhoto's access to the API; Meta stopped responding to Phhhoto about a possible joint project; Meta withdrew access to the iPhone Hooks; Meta launched Boomerang -- a purported clone of Phhhoto's product; Meta announced the change to its algorithm; and Phhhoto's new registrations dropped precipitously. All of these adverse actions occurred within a span of thirteen months; Phhhoto surely should have investigated.

Phhhoto "hypothesize[s] various reasons the app may have suddenly dropped in popularity," but fails to allege why it did not investigate the

15

algorithm.  J. App'x at 117 (AC ¶ 93).  Given Phhhoto's heavy reliance on Meta's infrastructure to conduct its own platform, Phhhoto has failed to plausibly allege that it acted with the requisite diligence.

The majority agrees that "Phhhoto presumably could have made the first discovery -- in which Phhhoto's post vanished from the Instagram feed -- in the period between April 2016 and October 2017." Maj. Opp. at 46.  The majority then reasons that had Phhhoto performed the experiment earlier, it would still not have been put on notice of Meta's anticompetitive behavior.  I disagree.  This discovery, along with the many prior anticompetitive incidents by Meta, in my view, should have led Phhhoto to discern Meta's probable involvement in an exclusionary scheme.  By not performing the simple experiment of observing a Phhhoto post from a user account earlier, Phhhoto failed to exercise reasonable diligence.

As to Phhhoto's second "accidental" observation involving the metrics discrepancy, I disagree that this observation was the necessary catalyst for Phhhoto to be placed on notice of Meta's anticompetitive behavior, and that Phhhoto did not need to perform this experiment purposefully.  First, as mentioned above, Meta's earlier conduct was sufficient to place Phhhoto on

16

notice of its claim. Second, although the majority "express[es] no view that the exercise of reasonable diligence invariably would require an antitrust plaintiff in Phhhoto's position to undertake a comparison of the sort that occurred here by chance," this reasoning undercuts the high standard equitable tolling requires and disregards the effortlessness of performing such a simple experiment. *Id.* at 47. Phhhoto did not need to create another company, or wait to create another company, to accomplish what it purportedly found by accident; Phhhoto could have simply created a second account under a different username to compare metrics. Bennett could have -- and should have -- posted a video to Phhhoto's Instagram account and a different Instagram account long before October 25, 2017. Performing this experiment strikes me as the bare minimum exercise of reasonable diligence, especially in consideration of the context of the parties' relationship.

   Finally, I respectfully disagree with the majority's statement that "the allegations concerning Phhhoto's diligence can be disputed and potentially disproven in the discovery process." *Id.* at 48. There is no factual dispute here. Whether Phhhoto's alleged facts met the diligence prong is a legal inquiry, and I fail to see how further discovery could suddenly demonstrate that Phhhoto acted

17

with diligence. And certainly not under the high standard that requires Phhhoto to have pled particular facts demonstrating how it sufficiently met the diligence prong to warrant the district court's tolling of the statute of limitations. Accordingly, Phhhoto has not plausibly alleged that it acted with due diligence, or that discovery could lead to a different conclusion.

## III.

The district court's judgment should be affirmed because it correctly dismissed Phhhoto's Amended Complaint as time-barred after concluding that the extraordinary measure of equitable tolling was unwarranted as a matter of law. This was the right result. I therefore dissent from the majority's decision to vacate and remand.